**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Mark A. Crawford, et al.,                                      Case No. 3:13CV1883

        Plaintiff

        v.                                                          **ORDER**

Donald L. Geiger, et al.,

        Defendant


This is a civil rights case under 42 U.S.C. § 1983. Following a nighttime encounter with law enforcement officers from several agencies, the plaintiffs seek damages for violations of their First, Fourth, and Fourteenth Amendment rights.

Pending are motions to dismiss by some of the defendants. (Docs. 30, 33, 34). For the reasons that follow, I grant the motions in part and deny them in part.


**Background**

The events giving rise to this suit occurred, according to the complaint, the allegations of which I accept as true, *e.g.*, *DirecTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007), during the night of August 26, 2012. Plaintiff Mark Crawford's mother, Jane Crawford, called him from her home to tell him she heard noises indicative of a break-in at an adjacent family business. She asked Crawford to come and investigate.

1

Accompanied by his nephew, plaintiff Brendon Reed, Crawford drove to the family business. In the meantime, Reed's mother (and Crawford's sister) plaintiff Debra Ornelas called 911 to report a suspected break-in.

Ornelas did not tell Crawford or Reed she had made that call.[1]

Crawford, armed with a shotgun and pistol, and Reed, armed with a semi-automatic rifle, drove in Crawford's pickup truck to the back of the business premises. They intended to illuminate that area with the vehicle's headlights.

When Crawford and Reed got there, a spotlight blinded them. Neither knew who was shining the light on them: they assumed it was from someone trying to break into the business. They got out of their truck with their weapons. Crawford immediately yelled out his name, he was the property owner, he was armed, the person or persons should identify themselves, and they were trespassing. He continued to yell, repeating this information several times.

As he was doing so, Crawford did not realize that the darkness and blinding spotlight concealed not a burglar, but defendant Allen County, Ohio, Sheriff's Deputy Donald Geiger. He had come to the scene after Ornelas's 911 call. As the encounter began, he was the only law enforcement officer present.

Instead of saying who he was and why he was there, Geiger immediately demanded that Crawford and Reed put down their guns and get on the ground. He threatened to shoot them if they did not comply.

Although Geiger at no time identified himself or his office, at some point Crawford heard the sound of radio traffic. Having served in the military and as a corrections officer, he then realized

---

[1] It is a fair inference that Ornelas also did not tell the 911 dispatcher that Crawford and Reed would be on, or arriving on, the premises.

the person confronting him might be a police officer. He put his weapons on the ground and told Reed to do so as well. Reed complied. Crawford then stepped backward toward his truck.

With his hand in the air, Crawford asked Geiger to identify himself and why he was trespassing. Geiger ignored the questions and yelled out that he was going to shoot them "in the fucking head" unless they got on the ground.

At about this time, Ornelas, having heard yelling, came from the front of the adjacent home to find out what was going on. She immediately told Geiger he was mistaken and that Crawford and Reed were the owner's son and grandson. She also said she had called Crawford and Reed for help because she thought there was a break-in. She told Geiger that Crawford and Reed did not know she had called 911.

Geiger ignored Ornelas. He made no effort to verify her statements.

Many other officers arrived, including defendants Allen County Sheriff's Deputy Roy Brock and Cory Lee, Elida, Ohio, Village Police Department Officer Jesse Evilsizer, Ohio State Highway Patrol (OSHP) Troopers Robert Gatchel and Daniel Edelbrock, and Lima, Ohio, City Police Officer Nicholas Hart. (Collectively, with Geiger, the "on scene officers"). Some had their weapons drawn.

Crawford continued to identify himself, stating, in addition to his name, that he was the property owner, legally armed per the castle doctrine (though all weapons were on the ground), and asking the officers to stop pointing their guns at him.

Defendant Brock knew Crawford; but he did not seek to have the other officers to stand down, which would have defused the situation.

Geiger, still blinding Crawford with his light, continued yelling and threatening to shoot him.

3

Reed and Ornelas were at the rear of Crawford's truck, unaware of why Geiger was continuing his threats to shoot Crawford.

Geiger then ordered Crawford to put his hands on the truck. Crawford did so. Geiger, twenty years younger and 100 pounds heavier than Crawford, then slammed Crawford's head onto the truck's hood, placing all his weight on Crawford's neck, and wedging Crawford against the truck. As he did so, he said, "Now you're going to jail, mother fucker."

As Geiger was doing so, Crawford told Reed and Ornelas to take out their cell phones and record Geiger's actions.

Whereupon defendant Hart ran up to Ornelas, struck her with the heel of his palm on her chest, knocking her off balance and against the truck bed. When Ornelas protested, Hart told her to "shut the fuck up." Defendant Lee then grabbed her arm and pushed her to the ground.

Hart then turned his attention to Reed, who was reaching for his cell phone. Hart took him to the ground, forcing his knees into Reed's back. Defendants Gatchel and Edelbrock assisted Reed, one putting his foot on Reed's back, the other pointing a tazer at his face.

Officers arrested the plaintiffs, placed them in police vehicles, and took them to the Allen County Jail. They remained confined there for several hours before being released.[2]

While awaiting being taken to the jail, Ornelas was in defendant Lee's car. Because Ornelas was having chest pains and difficulty breathing, she asked Lee to put the window down. He put it part way down.

---

[2] Though the complaint does not indicate one way or the other, a plausible inference is that no charges were filed against the plaintiffs.

4

Geiger came to the car and yelled at Ornelas, "Do you know how close [Reed] came to getting a fucking bullet in the chest." Ornelas tearfully replied, "He just got home from Iraq and Afghanistan serving this country and you're going to shoot him because I called for help." Geiger continued to yell at Ornelas, "He could be dead right now." Sobbing, Ornelas told him to get away from her.

At this point, Sergeant Brock Douglas of the Allen Country Sheriff's Department came to the car, pushed Geiger away, saying, "No, we're not going to do this." Lee closed the window, and, though Ornelas could not hear what was being said, saw several officer gathering and Geiger throwing his hand wildly in the air, apparently yelling.

The plaintiffs have also sued the heads (collectively, "supervisory officers") of the various agencies employing the on scene officers. Additionally, they have sued Allen County, the City of Lima, and the Village of Elida (collectively, the "governmental entity defendants"). They allege the supervisory officers failed to train and supervise the officers. With regard to the governmental entity defendants, plaintiffs assert derivative liability on the basis that the various officers were acting in furtherance of unconstitutional policies that those entities had adopted.

Based on these factual allegations, plaintiffs assert several claims for relief:

Count I:        § 1983: Fourth/Fourteenth Amendment unreasonable use of force;

Count II:       § 1983: Fourth/Fourteenth Amendment failure to intervene;

Count III:      § 1983: Fourth/Fourteenth Amendment false arrest and detention;

Count IV:       § 1983: First/Fourteenth Amendment right to film and record;

Count V:        § 1983: Fourth/Fourteenth Amendment violative conspiracy

Count VI:       Ohio Common Law: assault and battery;

5

Count VII:      Ohio Common Law: false arrest and detention; and

Count VIII:     § 1983: supervisory and derivative government entity liability.

OSHP Troopers Gatchel and Edelbrock and former OSHP Commandant Born seek partial dismissal as to Counts Two and Five through Seven, inclusive (Doc. 30). Defendants Hart, Martin, and the City of Lima (Doc. 33) and defendants Evilsizer, Hollis, and the Village of Elida. (Doc. 34) seek dismissal as to all claims.

For the reasons that follow, I:

1.      Grant the motion of former OSHP Commandant Born and, without prejudice, that of Gatchel and Edelbrock;

2.      Grant the motion of the Village of Elida, grant the motion of defendant Hollis with regard to on scene supervisory liability and without prejudice  as to failure to train liability; and deny in part and grant in part, without prejudice as to Evilsizer; and

3.      Grant the motion as to Martin with regard to on scene supervisory liability  and without prejudice  as to failure to train liability; grant the motion as to the City of Lima, without prejudice, and deny in part and, without prejudice grant in part the motion as to Hart.

### Introduction

The defendants' arguments rest largely, if not entirely, on either or both of two cornerstone doctrines, namely: 1) failure to satisfy the *Iqbal/Twombly* requirements, *Ashcroft v. Iqbal, ,*556 U.S. 662, 677-78 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); and 2) the qualified immunity available to law enforcement officers in a § 1983 case.

### 1. *Iqbal/Twombly*

The defendants contend the factual allegations in the complaint are, in many instances, too sparse to meet the *Twombly* requirement that plaintiffs plead "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 570.

As I discuss below, I agree as to several of plaintiffs' claims. As to those claims, however, my dismissal is, where I so indicate, without prejudice to the plaintiffs' right to conduct discovery and, if they develop facts to do so, seek leave to amend their complaint to re-allege those claims.

I take this approach because there is a reason for the lack of plaintiffs' knowledge and thus the sparsity of many of their factual allegations as to much that went on that night: namely, for much fo the time, they could not see what was happening or who was involved. For part of the time, an unknown person, unresponsive to demands that he identify himself, was blinding and threatening to shoot Crawford and Reed. For part of the time, Crawford was face down on the hood of his truck, and Reed and Ornelas were face down on the ground. Moreover, Hart had frustrated the ability of Reed and Ornelas to record the officers' actions.

The defendants should not profit from their having controlled what the plaintiffs could see and record by claiming the plaintiffs' ignorance precludes their ability to proceed with certain claims. This is so, even if, at present, plaintiffs have failed to plead those claims as fully as the law requires.

In other words, to the extent that the plaintiffs are ignorant of much that led to their seizure, detention, and arrest, that is so, in large part, because of the actions of one or more on scene officers. To the extent any of the defendants may, as plaintiffs' allege, have violated their constitutional rights, their present lack of knowledge of facts sufficient to overcome the *Iqbal/Twombly* hurdle should not permanently immunize the officers from having to defend their actions on their merits.

Because the case will continue in any event, discovery as to who did what that night – and, with regard to the supervisory officers, before that night, in terms of training[3] – can and will go forward. If that discovery fills in the factual gaps in the claims I now dismiss without prejudice, those claims likewise will go forward.

## 2. Qualified Immunity

The on scene officer movants contend they are entitled to qualified immunity, and thus are not answerable in damages to the plaintiffs.

Qualified immunity is not a defense to liability. Instead the doctrine, when applicable, precludes suit entirely. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The doctrine has this effect so the officers need not undergo the burdens of discovery and trial. *Id.*[4]

The Sixth Circuit has summarized the doctrine of qualified immunity and related principles:

Qualified immunity shields government officials from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Qualified immunity ordinarily applies unless it is obvious that no reasonably competent official would have concluded that the actions taken were unlawful. Qualified immunity "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" Qualified immunity applies irrespective of whether the official's error was a mistake of law or a mistake of fact, or a mistake based on mixed questions of law and fact.

---

[3] As I note below, there is no basis on which plaintiffs could allege *supervisory* liability, as opposed, possibly, to liability for failure to train. Discussion, § 1.a., *infra*. I also note that in *Houston v. Hill*, 482 U.S. 451, 461-62 (1987), the Supreme Court stated "a properly trained officer may reasonably be expected to 'exercise a higher degree of restraint' than the average citizen, and thus be less likely to respond belligerently to 'fighting words.'" (citation omitted).

[4] Because this case is going forward in any event, and because all on scene officers were witnesses to at least part of the events of that evening, allowing discovery as to the claims being dismissed without prejudice as to them will not broaden the scope of discovery that plaintiffs otherwise will be taking. A routine part of such discovery would also be the training each on scene officer received with regard to circumstances each encountered while there.

Plaintiff bears the burden of showing that defendants are not entitled to qualified immunity. Plaintiff must show both that, viewing the evidence in the light most favorable to her, a constitutional right was violated and that the right was clearly established at the time of the violation. If plaintiff fails to show either that a constitutional right was violated or that the right was clearly established, she will have failed to carry her burden. Moreover, to satisfy the second prong of the standard, plaintiff must show that the right was clearly established in a "particularized sense," such that a reasonable officer confronted with the same situation would have known that using deadly force would violate that right.

*Chappell v. City Of Cleveland,* 585 F.3d 901, 907 (6th Cir. 2009) (citations omitted).

To determine whether an officer is entitled to qualified immunity a court must determine whether: 1) the plaintiff has shown the officer violated a constitutional right, and 2) if so, the constitutional right was "clearly established" when he or she did so. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *receded from in part, Pearson v. Callahan,* 555 U.S. 223 (2009).

For a constitutional right to be "clearly established," the

contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton,* 483 U.S. 635, 640 (1987).

To determine whether a constitutional right is clearly established, a court, "must look first to decisions of the Supreme Court, then to decisions of [the Sixth Circuit] and other courts within [the Sixth Circuit], and finally to decisions of other circuits." *Baker v. City of Hamilton*, 471 F.3d 601, 606 (6th Cir. 2006) (citations omitted).[5] Thus, even if neither the Supreme Court nor the Sixth Circuit has held that a right is clearly established, they need not have done so. Narrowly

---

[5] *But see Walton v. City of Southfield*, 995 F.2d 1331, 1336 (6th Cir. 1993) ("[I]t is only in extraordinary cases that we can look beyond Supreme Court and Sixth Circuit precedent to find clearly established law.").

circumscribed, unequivocal, unanimous, and on point case law from other circuits suffices. *Blake v. Wright*, 179 F.3d 1003, 1007 (6th Cir. 1999).

To be sure, those decisions must both point unmistakably to the unconstitutionality of the conduct complained of and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting. *Durham v. Nu'Man*, 97 F.3d 862, 866 (6th Cir.1996) (citation and quotation omitted). Especially where there is no declarative Supreme Court precedent, lower courts must have defined the contours of the constitutional right at issue with sufficient certainty and clarity that it "would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier, supra,* 533 U.S. at 202 (2001).

## Discussion

I first discuss the claims applicable to the supervisory and governmental entity movants, then those applicable to all on scene officer movants, and, finally, those applicable to only some of the on scene officer movants.

### 1. Claims Applicable to All Supervisory Officer and Governmental Entity Movants: Count VIII

The supervisory officers and governmental entities seek dismissal of plaintiffs' claims of supervisory and derivative liability.

### a. Supervisory Officers

The complaint does not allege any of the supervisory officers was on the scene and thus directly involved in any of the acts giving rise to this suit. Absent personal involvement in the acts giving rise to a claim of constitutional violation, plaintiffs cannot prevail against the supervisory

10

officers. *Rizzo v. Goode*, 423 U.S. 362, 370–371 (1976) (mere right to control without actual exercise of any control or direction not enough to support § 1983 liability for failure to supervise).

Thus, the only potentially viable claim against the supervisory officers is that they violated their overall duty to train their subordinates on how to do their jobs lawfully.

The only factual contentions from which a rational trier of fact could plausibly conclude one of the officers on scene officer movants was not as well trained as he should have been is the conduct attributed to defendant Hart. But this, without more, does not say anything about the training he actually received or its adequacy. Nor does his conduct alone indicate whether, despite otherwise adequate training, he simply ignored its lessons.

Thus, regardless of the inference that a rational trier of fact might draw from Hart's actions (if it found those actions to have been as plaintiffs allege), the complaint needs more factual underpinning about his training to survive the present motion to dismiss. *E.g., Birgs v. City of Memphis*, 686 F. Supp. 2d 776, 780 (W.D. Tenn. 2010) (dismissing failure to train claims where plaintiff failed to meet burden of pleading more than conclusory statements).

Dismissal of the failure to train claim against the supervisory officers movants shall, however, be without prejudice.

### b. Governmental Entities

In *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 694 (1978), the Supreme Court held that, to prevail on a claim against a governmental entity based on an employee's violation of the Constitution, a plaintiff must prove three elements: 1) an official "policy" or "custom;" 2) created by the entity; 3) execution or implementation of which caused the particular constitutional injury.

11

As stated in *Morris v. Newberry Correctional Facility,* 2013 WL 1223646, *3 (E.D. Mich.) (citations partially omitted):

> It is true that the *Monell* Court found that when the acts of individual employees represent the government's (or in this case, the corporation's) custom or policy, the municipal or corporate entity can be held liable. In this case, however, the Second Amended Complaint alleges only in conclusory fashion that Corizon has a policy or procedure that resulted in the alleged [constitutional] violation. This is insufficient under *Iqbal*. *See Wooten v. Spigner*, 2011 WL 5075692, *4 (E.D. Mich.) ("Although plaintiff vaguely alleges that the City is liable because of its policies, practices, and customs, the complaint does not allege any specific policies, practices, or customs which amounted to deliberate indifference to or actually caused the alleged constitutional violations on the part of the individual defendants. Under *Twombly* and *Iqbal*, the complaint fails to allege sufficient facts to state a claim against the City that is plausible on its face"); *Center for BioEthical Reform, Inc. v. Napolitano*, 648 F.3d 365, 372–373 (6th Cir. 2011) ("vague and conclusory allegations and arguments" insufficient to support the existence of a policy).

Plaintiffs here plead no facts about a specific governmental policy, either explicit or implicit, to endorse or tolerate constitutional violations by the on scene officers. Instead, the allegations are conclusory, and thus insufficient. *See, e.g., Buster v. City of Cleveland*, 2010 WL 330261, *9 (N.D. Ohio) (dismissing *Monell* claim that only "tender[ed] naked assertions devoid of further factual enhancement"); *Williams v. City of Cleveland*, 2009 WL 2151778, *2 (N.D. Ohio) (dismissing *Monell* claim because the complaint merely recited the elements of a § 1983 claim against a municipality in a conclusory manner).

I will, however, grant the motions to dismiss without prejudice.

### 2. Claims Applicable to All On Scene Officer Movants

### a. Count II - Failure to Intervene

In the Sixth Circuit the elements of a § 1983 failure to intervene in the face of a fellow officer's excessive use of force are:

> [A] police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring.

*Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997).

Here, I agree with the defendants that the present complaint fails to provide a sufficient factual predicate to state a plausible, non-conclusory claim. Once, however, the plaintiffs find out through discovery who arrived on the scene, and what they saw and heard after they were there, they may (or may not) be able to meet the *Iqbal/Twombly* standard.

For now, however, this claim is dismissed without prejudice.

### b. Count IV - First Amendment/Right to Film

In seeking dismissal of this count, defendants argue that there is no First Amendment right to film police activities of the sort giving rise to this suit. Even if there is such right, they argue, that right has yet to be clearly established, so the doctrine of qualified immunity entitles the on scene officers, even if they impaired any such right, to dismissal.

### I. There is a First Amendment Right
### to Record Public Activities by Police Officers

Freedom of the press, as protected under the First Amendment, "goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 783 (1978). The Amendment extends to "news gathering." *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972). This, in turn, ensures and enhances, to the maximum extent possible, "free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966).

13

The First Amendment protects not just the right of the press to gather news – it affords that right to the general public as well. *Branzburg*, *supra*, 408 U.S. at 684 ("It has generally been held that the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally.").

Technology has put the ability to gather and disseminate newsworthy information literally in the hands of anyone who has a cell phone. With increasingly frequency, events of local, regional, national, and even international significance first and frequently most vividly come to public attention because a bystander saw, recorded, and, often as those events were underway, transmitted what was happening.[6]

Technology has thus not just greatly expanded public ability to learn about newsworthy events, but also to do so with once unimaginable speed and certainty.[7] The camera's eye can distort or even deceive, but even then, it can do so to a lesser and usually more readily detectable extent than the unrecorded observation and recollection of an eyewitness.

The Sixth Circuit has not ruled specifically on the right of the public openly to film police officers and their actions in a public setting. Other circuit courts have, however, and those courts have found the right unquestionably exists under the First Amendment. *ACLU v. Alvarez*, 679 F.3d 583, 599-560 (7th Cir.), *cert. denied*, — U.S. ——, 133 S. Ct. 651 (2012) (holding that an Illinois

---

[6] *See, e.g.,* Geoffrey J. Derrick, *Qualified Immunity and the First Amendment Right to Record Police*, 22 B.U. Pub. Int. L.J. 243, 256-257 (Summer 2013) (noting, "cell phones have become pervasive in our society .   .   . [and] recordings have supplied critical proof in § 1983 actions brought against police officers.   .   .  .").

[7] *Id.* at 263 (noting, "Citizen recordings serve as an unfiltered record of the conduct of government officials and are an essential part of the information-gathering process that undergirds a free and open marketplace of ideas.").

14

eavesdropping statute did not protect police officers from a civilian openly recording them with a cell phone); *Glik v. Cunniffe*, 655 F.3d 78, 79 (1st Cir. 2011) (holding there is an "unambiguous[]" constitutionally protected right to videotape police carrying out their duties in public); *Smith v. Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (finding plaintiffs "had a First Amendment right, subject to reasonable time, manner and place restrictions, to photograph or videotape police conduct"); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) (recognizing  plaintiff's videotaping of police officers as a "First Amendment right to film matters of public interest").[8]

Thus, I find there is a First Amendment right to openly film police officers carrying out their duties.[9]

### ii. The Right to Film is Clearly Established

Despite the existence, as of the August 12, 2012, date of the events giving rise to this case, of four circuit court opinions agreeing that the First Amendment protected the right to film public police activities, the movants assert a putative circuit split on the issue. Accordingly, they argue that, in the absence of a definitive Sixth Circuit decision, the right to film was not, as to them that

---

[8] *See also* Seth F. Kreimer, *Pervasive Image Capture and the First Amendment: Memory, Discourse, and the Right to Record*, 159 U. Pa. L. Rev. 335, 367, 369 (2011) (noting, "In the last decade, a solid line of courts has recognized that image capture can claim protection under the First Amendment" and any doubts as to "whether prohibitions of image capture should raise First Amendment objections .   .   . are ultimately unsustainable.").

[9] I do not, however, rule one way or the other on the First Amendment right to record police officers surreptitiously. That is not at issue in this case. According to the complaint, Crawford gave notice to the police officers that they would be filmed when he told Reed and Ornelas to take out their cell phones and start recording. Had Hart not intervened to prevent them from doing so, all on scene officers would have been able to see them recording the ensuing events.

evening, clearly established. Thus, they contend, their actions in keeping Reed and Ornelas from filming them and other officers enjoyed the protection of qualified immunity.

In making this argument, defendants point to *Kelly v. Borough of Carlisle*, 622 F.3d 248, 262 (3d Cir. 2010), and *Szymecki v. Houck*, 353 F. App'x 852 (4th Cir. 2009). Each case is distinguishable and neither establishes a circuit split undercutting the fact or effect of unanimity among the circuits having decided the precise issue in this case.

In *Kelly*, the plaintiff recorded a one-on-one encounter between himself and the officer who had stopped him for speeding. On noticing that plaintiff was doing so, the officer told him to stop and seized the camera.

The plaintiff sued alleging a violation of his First Amendment right to film police. The Third Circuit held in *Kelly* that there was

> insufficient case law establishing a right to videotape police officers during a traffic stop to put a reasonably competent officer on 'fair notice' that seizing a camera or arresting an individual for videotaping police during the stop would violate the First Amendment.

622 F.3d at 262.

Unlike the driver stopped in *Kelly*, the plaintiffs here were outside on their own property and, taking the complaint as true, were neither posing a threat to nor either interfering with or impairing the officers in any lawful activities. Indeed, as noted elsewhere in this opinion, by the time Crawford asked Reed and Ornelas to film what was happening, the officers, a rational trier could find, were acting without lawful authority.

Moreover, as the court in *Kelly* recognized, traffic stops are "inherently dangerous situations." *Id.* (citing *Arizona v. Johnson*, 555 U.S. 323, 330 (2009)). The court in *Glik*, *supra*, also distinguished the *Kelly* decision, noting that "a traffic stop is worlds apart from an arrest on the

16

Boston Common." 655 F.3d at 85. Thus, I find that *Kelly* does not affect my analysis as to the clearly established nature of the plaintiffs' First Amendment right to film the officers that evening.

The other case to which movants point, *Szymecki,* is an unpublished *per curiam* opinion that concludes, without discussing facts or law, that the plaintiff's "First Amendment right to record police activities on public property was not clearly established in this circuit *at the time of the alleged conduct*." 355 F. App'x at 853 (emphasis supplied).[10]

According to the plaintiff/appellant's opening brief in *Szymecki*, an officer encountered the plaintiff's husband, who was carrying a publicly visible pistol in a holster at a "Harborfest" in Norfolk, Virginia. The officer told the husband he would have to secure his firearm in a car. In response, the husband asserted a right under Virginia law to carry the weapon openly anywhere he wanted. In the meantime, a "red-faced" Lieutenant had arrived; when he ordered the husband to be handcuffed, the plaintiff took out her cell phone to record the officers and her husband as the officers were taking him away. Whereupon an officer told her to "put it away or go to jail." *Szymecki v. Houck*, 2009 WL 1030790, *l. (Appellant's Opening Brief).

The *per curiam*, unreported opinion in *Szymecki* is almost as unhelpful to the movants as a blank page. In addition to the complete absence of substantive analysis or discussion, pre-*Alvarez* and -*Glick* date of the encounter and ensuing decision, and lack, as an unreported decision, of precedential effect, *e.g., United States v. Stewart*, 595 F.3d 197, 199 n.1 (4th Cir. 2010), the facts are, as in *Kelly*, distinguishable from those here.

---

[10] The incident in *Szymecki* occurred on June 10, 2007, considerably prior to the 2011 decision in *Glick* and May 8, 2012, decision in *Alvarez*.

17

There, an openly armed individual attending a public festival refused an instruction to place his weapon out of harms way. The potential that the plaintiff's efforts to film the encounter had for interfering with the officer's efforts to maintain peace and protect members of the public was far greater than in this case.

Here, there were multiple armed officers, some with weapons drawn, on the scene, Crawford and Reed were no longer armed, and Crawford only asked Reed and Ornelas to create a record once Geiger slammed into him, an action which a trier of fact could find was unlawful.

The First Circuit in *Glik* found nothing in *Szymecki* to its conclusion that the First Amendment right to film was firmly established. 655 F.3d at 82. Indeed, the court simply noted that the opinion in *Szymecki* was both unpublished and without any substantive discussion. *Id.* at 85. Like the First Circuit, I find no basis in *Szymecki* that dissuades me from my conclusion that, as of August 26, 2012, the right of a citizen to film police activity in a public setting where there was no present danger of harm to officers or others was clearly established.[11]

Nor does the district court's opinion in *King v. City of Indianapolis*, 2013 WL 4602202, *4-5, (S.D. Ind.), affect my conclusion. Though the court held no right to film was firmly established as of the date of the plaintiff's February, 2011, arrest, the court also noted that the arrest pre-dated *Glick* and *Alvarez. Id.* at *5. The court in that case did recognize, however, that plaintiff's "First Amendment interests are foundational and strong." *Id.*

---

[11] In *Alvarez* the Seventh Circuit noted, "This case does not, of course, raise a question of qualified immunity; we do not need to take sides in the circuit split in order to decide this case." 679 F.3d at 601 n.10.

18

Here, at the time of the August, 2012, encounter, the First, Seventh, Ninth, and Eleventh Circuits had issued clear and consistent opinions finding that the First Amendment right to openly record police activity existed. There was no indistinguishable circuit opinion to the contrary.

Finally, while inapplicable to whether a right is clearly established, many district courts have also found a First Amendment right to openly record police activity. *See, e.g.*, *Askins v. U.S. Dep't of Homeland Security*, 2013 WL 1561546, \*4 (S.D. Cal.) ("There is no doubt that citizens enjoy a First Amendment right to photograph police officers performing their responsibilities in public places"); *Pomykacz v. Borough of W. Wildwood,* 438 F. Supp. 2d 504, 513 n.14 (D.N.J. 2006) (finding that plaintiff's photography of police should be analyzed under First Amendment); *Robinson v. Fetterman*, 378 F. Supp. 2d 534, 541 (E.D. Pa. 2005) (holding that the First Amendment protected videotaping state troopers).

### iii. Time, Place, and Manner Restrictions

Defendants' final argument is that even if a First Amendment right exists and it is clearly established, plaintiffs do not plausibly allege that there was a violation of this right. In support, defendants cite *Glik*, *supra*,  655 F.3d at 84, for the proposition that any filming of officers must be done from "a comfortable remove" and without interfering with the performance of the officers' duties.

Defendants are correct that the filming of police officers is subject to reasonable time, place, and manner restrictions. *Id*. Here, however, the facts plausibly allege that Ornelas and Reed were not interfering with the duties of the on scene defendants. While the complaint does not state precisely how far Ornelas and Reed were standing from the police officers, there is no indication that they were in the way of the police. As the complaint alleges, they were at the back of

19

Crawford's pickup truck while Crawford was at the hood. Considering there is no specific distance required to be at "a comfortable remove," a rational trier of fact could find that Ornelas and Reed were not interfering with the duties of the on scene defendants.

Lastly, defendants argue that there was at least reasonable suspicion that Reed and Ornelas were armed and were reaching for weapons, not cell phones. Thus, defendants contend, it was not objectively unreasonable to prevent Reed and Ornelas from taking out their cell phones.

As I discuss more fully in Discussion, § 3.b., *infra*, a rational trier of fact could find that there was no objectively reasonable basis for any officer to believe that either Ornelas or Reed were reaching for weapons, instead of their cell phones.

Therefore, I deny the on scene defendants' motion to dismiss Count IV.

### c. Count V - Civil Rights Conspiracy

In the Sixth Circuit:

A civil conspiracy under § 1983 is "an agreement between two or more persons to injure another by unlawful action." To prevail on a civil conspiracy claim, [plaintiff] must show that (1) a "single plan" existed, (2) [defendant] "shared in the general conspiratorial objective" to deprive [plaintiff] of his constitutional (or federal statutory) rights, and (3) "an overt act was committed in furtherance of the conspiracy that caused injury" to [plaintiff]. "Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy [and] [e]ach conspirator need not have known all of the details of the illegal plan or all of the participants involved."

*Bazzi v. City of Dearborn,* 658 F.3d 598, 602 (6th Cir. 2011) (citations omitted).

Thus, in our Circuit, contrary to the defendants' suggestion,

proof of a formal agreement is not necessary to establish an unlawful conspiracy; indeed, a conspiracy "may be inferred from acts done with a common purpose." Further, "[i]t is only necessary that a defendant know of the conspiracy, associate himself with it, and knowingly contribute his efforts in its furtherance."

\*  \*  \*  \*  \*

20

> The Sixth Circuit has also stated that a tacit or mutual understanding between the parties is enough to prove a conspiratorial agreement. Further, "A conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan."

*United States v. Barger*, 931 F.2d 359, 369 n.6 (6th Cir. 1991) (citations omitted).

Plaintiffs' present complaint, containing, as it does, only conclusory assertions about the existence and implementation of a conspiracy, founders, however, under the *Iqbal/Twombly* doctrine. *E.g., Twombly, supra*, 550 U.S. at 555 ("conclusory allegations of a conspiracy are insufficient"). Indeed, long before the Supreme Court adopted that standard, the Sixth Circuit took the position that it was "well-settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim." *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987).

Thus, until and unless discovery provides a factual basis sufficient to allege a plausible claim that meets the "relatively strict," *Fieger v. Cox*, 524 F.3d 770, 776 (6th Cir. 2008), pleading standard applicable to conspiracy claims, I must dismiss, albeit without prejudice, plaintiffs' claim of civil conspiracy.

### 3. Other Claims Applicable to On Scene Officer Movants

#### a. Counts VI & VII -
#### State Common Law Tort Claims

The on scene officer movants seek dismissal of the state common law tort claims (Count VI, assault and battery and Count VII, false arrest and imprisonment) on the basis of immunity.

With regard to Gatchel and Edelbrock, the plaintiffs concur that their motion, based on the Eleventh Amendment, is well taken. Their motion to dismiss shall be granted with prejudice.

21

Hart and Evilsizer, who plaintiffs allege acted maliciously in unlawfully assaulting, battering, and arresting and detaining them, seek dismissal on the basis of Ohio's immunity statute, O.R.C. § 2744.03(A)(6). That provision immunizes an officers' actions from state law-based civil liability, subject to certain limited exceptions. One of those exceptions arises when an officer was malicious in his unlawful acts.

Hart and Evilsizer argue that plaintiffs' allegation of malice is conclusory. They are correct: merely alleging that a defendant acted maliciously is not sufficient. *See, e.g., Lisboa v. Lisboa*, 2011 WL 319956, *5 (Ohio App.) ("Appellant's complaint merely contains general conclusory statements that [an individual] acted maliciously and in bad faith. Such unsupported conclusions are not sufficient to withstand a motion to dismiss.").

Dismissal of these claims as to Hart and Evilsizer, is, however, without prejudice.

### b. Count III - Fourth Amendment False Arrest and Detention

The plaintiffs allege that Hart and Evilsizer unlawfully detained and arrested them in violation of the Fourth Amendment. That Amendment ensures the "right of the people to be secure in their persons, . . ., against unreasonable . . . seizures." A "seizure," in Fourth Amendment terms, occurs "when there is a governmental termination of freedom of movement through means intentionally applied." *Brower v. County of Inyo*, 489 U.S. 593, 596–597 (1989). A "person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall,* 446 U.S. 544, 553 (1980).

Detention is a Fourth Amendment seizure, *I.N.S. v. Delgado,* 466 U.S. 210, 215 (1984) ("if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave"): *Colorado v. Bannister*, 449 U.S. 1, 4 (1980) (stop of vehicle and

ensuing detention of occupants is a seizure), as is an arrest. *Ashcroft v. al-Kidd*, — U.S. —, 131 S. Ct. 2074, 2080 (2011). Use of force to restrain freedom of movement constitutes a seizure. *Terry v. Ohio*, 392 U.S. 1, 20 n.10 (1968) ("[W]hen the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may . . . a 'seizure' has occurred.").

If plaintiffs Ornelas and Reed establish the facts as they allege them in the complaint, they will have shown that Reed seized them when he struck Ornelas with the heel of his palm and then took Reed to the ground. Evilsizer, for his part, engaged in a seizure when he handcuffed Crawford.

The next question is whether the seizure of any plaintiff was lawful.

Before beginning to address that question, I comment on certain statements in Hart's motion to dismiss.

According to Hart's motion:

1.     He "encounter[ed] two non-compliant men brandishing firearms . . .";

2.     One of the firearms was an "assault rifle";

3.     Ornelas "began interfering with the investigation";

4.     Ornelas gave "officers inconsistent information contrary to Crawford's claim the he was the owner of the premises"; and

5.     Reed "attempted to reach into his pocket to retrieve his cell phone."

(Doc. 33, at 6).

These assertions misstate the complaint's allegations.

First, the complaint does not indicate when anyone, including Hart, arrived after the encounter began. Hart cannot therefore go beyond the complaint's allegations by asserting he saw any act of noncompliance on the part of Crawford and Reed. In any event, if, when he arrived on the scene, they were still armed, the facts alleged in the complaint, are: Crawford was identifying

23

himself, stating he was the owner and lawfully armed, and demanding that whoever was threatening him identify himself. If present then, Hart knew that Geiger was not responding to Crawford (and, inferentially, Hart himself did not do so). Hart also would have observed Crawford and Reed, even without a response from Geiger (or Hart) as to who he was (or who they were), disarmed themselves and placed their hands in the air.

At that point, neither Crawford nor Reed was brandishing anything, and neither, by any objective standard, was engaged in any threatening noncompliance. This was particularly so, a rational trier of fact could find, given the complaint's allegation that "[m]any other police officials" had "arrived at the scene, including . . . Hart, some with their guns drawn." (Doc. 1, at 8, ¶ 28).

Second, that Ornelas began "interfering with the investigation" presumes, without factual basis in the complaint, that an "investigation" was occurring and Ornelas statement to Geiger (not Hart) constituted "interfering" with such "investigation."

Viewed objectively, a rational trier of fact could find that no "investigation," in any conventional and objective sense of that term, was occurring. Even if what was happening could be viewed as an "investigation," a rational trier of fact could find that, viewed objectively, Ornelas's statements (the only conduct the complaint attributes to her) sought to explain and clarify the situation – and thus assist, not interfere with – the officers whom she had summoned with her 911 call.

Third, the complaint states Ornelas spoke to Geiger, not anyone else. It does not allege that Hart or anyone else heard what she said. Thus, Hart's brief errs when it seeks, in crucial part, to

extend qualified immunity to him on the basis of any inconsistency between her statement about who owned the property and Crawford's assertion he was the owner.[12]

Fourth, the complaint says nothing about Reed (or Ornelas) reaching anywhere, much less into a *pocket*: it simply states, "Crawford yelled for Ornelas and Reed[,] instructing them to pull out their cell phones . . . ." (Doc. 1, at 9, ¶ 30).

Fifth, the reference in Hart's motion to an "AR-15 assault rifle" mischaracterizes what the complaint states, which is, "Reed had a DPMS Panther semi-automatic sporting rifle" (Doc. 1, at 7, ¶ 24), not an "AR-15 assault rifle."

Looking at what the complaint actually alleges, rather that what Hart's brief would like it to say, a rational trier of fact could, if persuaded of the truthfulness of its allegations, find:

- The three plaintiffs were at all times lawfully on the premises, and the on scene defendants were on actual notice of that fact in light of Crawford's repeated statements of identity (he was also known to one of the on scene officers, Allen County Deputy Sheriff Brock) and ownership;

- Crawford and Reed were at all times in lawful possession of their firearms; if they pointed them at Geiger, they did so with an objectively reasonable, good faith belief that they were confronting an unknown trespasser and possible burglar;

- Once Crawford apprehended, despite Geiger's unresponsiveness to his demands that Geiger identify himself, that their assailant may have been a police officer, Crawford and Reed disarmed themselves and submitted to his authority;

- Once Crawford and Reed disarmed themselves and placed their hands in the air, no reasonable basis existed for any on scene officer to apprehend that either was armed and dangerous;[13]

---

[12] A rational trier of fact could find, in any event, that any inconsistency was insignificant, and provided no basis for reasonable suspicion that anyone had committed, was committing, or was about to commit a crime.

[13] Officers who saw them disarm themselves would have seen them do so; officers arriving later would have perceived weapons on the ground and Crawford and Reed with their

- Failure to get on the ground, as Geiger was demanding, did not constitute such noncompliance as to justify the ensuing forceful seizure, arrest, and detention;

- No plaintiff committed any crime, and there was no objectively reasonable basis for believing that they had, in light of what officers objectively knew before the forceful seizure, detention, and arrest;[14]

- There being no reasonable basis for concluding that any plaintiff was armed and dangerous, there was no lawful grounds for any on scene officer to seize the plaintiffs; those who did so acted without, reasonable suspicion or probable or other lawful cause;

---

hands in the air. Also some officers for some period of time would have heard Crawford demanding to know who his armed assailant was and Geiger's failure to answer. The likelihood of dangerousness, though non-existent once the guns were on the grounds and hands were in the air, would, in any event, have lessened as more officers arrived and "many" had their guns drawn.

[14] Officers who arrived before Crawford and Reed disarmed themselves and put their hands in the air, would, on the basis of the complaint's allegations, have known that Crawford was asserting ownership of the premises and a right to be armed when confronted by an apparent trespasser; they would also have known that, despite Crawford's repeated demands (and, by inference, his manifest ignorance of who and what was confronting him while blinded and being threatened by an armed, but unidentified and unidentifiable assailant), neither Geiger nor they was not identifying himself or his office. Those who arrived after Crawford and Reed put their firearms on the ground would not have seen any act that they objectively could have construed as criminal.

With regard to Ornelas, her only contact with any officer was her unsuccessful effort to inform an unresponsive Geiger that it was she who had placed the 911 call, neither Crawford nor Reed was aware of that fact, and Crawford and Reed were the owner's son and grandson. At no time was she armed, nor was there at any time an objectively reasonable basis for any officer to apprehend that she was armed and dangerous. She was by the truck, confronted by several armed law enforcement officers, including one who had threatened to kill either Crawford or Reed or both.

A rational trier of fact could find that no reasonable officer could, on the basis of those facts and the presence of multiple armed officers, reasonably apprehend that Ornelas was armed and dangerous. Likewise, on the basis of the facts alleged in the complaint, a rational trier of fact could find that, on an objective basis in light of the totality of the circumstances, no reasonable officer could apprehend that Reed was trying to recover a gun.

26

- When Officers Evilsizer helped Geiger handcuff Crawford, he had no lawful authority for doing so because he could not have reasonably apprehended that Crawford was armed and dangerous or had committed or was committing a crime; under those circumstances no reasonable officer could have concluded objectively that he was lawfully authorized to impose any restraint on Crawford; and

- For the same reasons, Officer Hart unjustifiably and unlawfully seized and used unreasonable force against Ornelas; and Officer Hart unjustifiably and unlawfully seized and used unreasonable force against Reed.[15]

Were a rational trier of fact to find plaintiffs proved these complaint-grounded facts (and, to the extent the instructions and evidence called on the trier to do so, complaint-grounded mixed questions of fact and law), they would have established violations of the Fourth Amendment by Hart and Evilsizer.

The next question becomes whether the plaintiffs would also have met their burden of proving that qualified immunity protected neither defendant from liability.

The law in that respect is clear: qualified immunity does not protect an officer who seizes an individual without lawful cause. Thus, in *Wilson v. Martin*, 2013 WL 5567729, *2 (6th Cir.) (Unpublished disposition) (emphasis supplied), the court stated

---

[15] The Supreme Court outlined the factors for determining whether the force an officer used to subdue a subject was excessive in *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citation omitted):

> Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

A rational jury could find, if plaintiffs prove the allegations of the complaint, that neither Ornelas nor Reed had done anything criminal, posed an immediate threat to the safety of officers or others, was resisting in any way, or trying to flee.

27

> *based on the allegations in the complaint* the officers had no legal basis to order [plaintiff] to stop in the first place. Thus, *at this stage of the litigation*, the officers are not entitled to qualified immunity as to [her] claims for false arrest, false imprisonment, and unlawful seizure and detention.

*See also, e.g., Leonard v. Robinson*, 477 F.3d 347, 361 (6th Cir. 2007) (officer making arrest without probable cause not entitled to qualified immunity).

The facts plaintiffs have alleged, if proven, would justify a finding of a lack of lawful cause to seize, arrest, or detain any of the plaintiffs. That being so, qualified immunity protects neither from potential liability

The right not to be subjected to excessive force is equally well established. As stated in *Norton v. Stille,* 526 F. App'x 509, 513-514 (6th Cir. 2013) (unpublished disposition) (citation omitted):

> It is clearly established that officers may not use force on a detainee who is subdued and controlled. "[P]eople who pose no safety risk to the police [have a right] to be free from gratuitous violence during arrest." When force is used on a detainee who poses no threat to officers or anyone else, that force is excessive and it is a violation of the detainee's Fourth Amendment rights.

*See also Correa v. Simone,* 528 F. App'x 531, 535 (6th Cir. 2013) (no immunity where officer tazed non-resistant § 1983 plaintiff); *McCaig v. Raber*, 515 F. App'x 551, 555 (6th Cir. 2013) and cases cited therein.

Thus, were a trier of fact to find that Ornelas and Reed were non-resistant and not posing a threat to anyone when Hart struck Ornelas and took Reed to the ground, qualified immunity would not protect him from liability.

### Conclusion

The plaintiffs' complaint, taking all its factual allegations as true, alleges violations of their constitutional rights, and, to a limited extent, the potential liability of some of the defendants on some the claims. This case will, accordingly, go forward, at least as to those claims.

As to some claims, the complaint's allegations are presently too conclusory to overcome the motions to dismiss. Dismissal shall be with prejudice with regard to plaintiffs' state law claims (dismissal being uncontested) as to defendants Gatchel and Edelbrock and their claim of derivative liability against the supervisory officers (for want of alleged personal involvement in the encounter). Dismissal of plaintiffs' claims otherwise is without prejudice.

It is, accordingly hereby

ORDERED THAT:

1.  Defendants' motions to dismiss (Docs. 30, 33, 34) be, and the same hereby are granted with respect to plaintiffs' claims in:

    a.  Count II (failure to intervene), as to all on scene officer movants, without prejudice;

    b.  Count V (conspiracy) as to all on scene officer movants, without prejudice;

    c.  Counts VI and VII (state tort law claims) as to defendants Gatchel and Edelbrock with prejudice as to further proceedings in this court and case, and the other on scene movants without prejudice; and

    d.  Count VIII as to the supervisory defendants with prejudice as to derivative liability for the on scene actions of their subordinates and without prejudice as to claims of failure to train; and

    e.  As to the governmental entity defendants without prejudice.

2.  Defendants' motions to dismiss be, and the same hereby otherwise are overruled.

The Clerk shall schedule a status/scheduling conference, to be held forthwith.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge

29