## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION


Mark A. Crawford, et al.,                                    Case No. 3:13cv1883

       Plaintiffs,

       v.                                                **ORDER**

Donavin L. Geiger, et al.,

       Defendants.


This is a civil rights case under 42 U.S.C. § 1983. Following a nighttime encounter with law enforcement officers from several agencies, plaintiffs seek damages for violations of their First, Fourth and Fourteenth Amendment rights.

Pending are plaintiffs' motion for leave to file an amended complaint, (Doc. 80), and defendants' motions for summary judgment. (Docs. 66, 67, 69, 77). For the reasons that follow: 1) I deny plaintiffs' motion; and 2) I grant defendants' motions in part and deny them in part.

### Background

The parties vigorously dispute the facts of this case. For the purposes of summary judgment, however, I accept plaintiffs' version of the facts as true. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

The events giving rise to this suit occurred during the night of August 26, 2012. (Doc. 72 at 60-61; Doc 81-2 ¶ 2). Plaintiff Mark Crawford's mother, Jane Crawford, called him from her home to tell him she thought she heard someone breaking into an adjacent warehouse she owned. (Doc. 62 at 29-36). She asked Crawford to come investigate. (*Id.*).

1

Crawford, arming himself with a shotgun and pistol, and his nephew, plaintiff Brendon Reed, arming himself with a semi-automatic rifle, started the short drive to the warehouse in Crawford's pickup truck. (Doc. 70 at 28-32, 86-87, 233-34; Doc. 71 at 65-66, 70-74, 79, 109, 166-71). In the meantime, Crawford's sister (also Reed's mother), plaintiff Debra Ornelas, reported the suspected break-in to a 911 dispatcher. (Doc. 65 at 21-22; Doc. 72 at 73). Crawford and Reed were unaware she had done so. (Doc. 72 at 87-88).

Shortly thereafter, defendant Allen County, Ohio, Sheriff's Deputy Donavin Geiger, responding to the dispatcher's broadcast about the suspected break-in, arrived at the location. (Doc. 72 at 82-83). He spoke briefly with Ornelas, ordering her to return to the house and stay there. (*Id.* at 94-96).

Crawford drove to the rear of the building "dynamically," turning on the truck's bright lights and making loud noises to scare away any intruders. (Doc. 71 at 112-13).

When Crawford and Reed arrived, a spotlight blinded them. (Doc. 71 at 115-17; Doc. 70 at 45). Neither knew who was shining the light at them; they assumed it was someone trying to break into the warehouse. (Doc. 71 at 115-17; Doc. 70 at 45).

They got out of the truck and aimed their weapons in the direction of the spotlight. (Doc. 71 at 116-17; Doc. 70 at 153, 232-33). Crawford immediately identified himself as the property owner,[1] stated he was armed, and demanded the unknown person identify himself because he was trespassing. (Doc. 70 at 53). He repeated that information several times. (*Id.*). Crawford also asserted he was lawfully armed under the "Castle Doctrine." (Doc. 70 at 52).

Crawford did not realize the darkness and blinding spotlight concealed not a burglar, but Deputy Geiger. (*Id.* at 54). Deputy Geiger had surreptitiously approached the rear of the

---

[1] In fact, Crawford's mother owned the property. (Doc. 62 at 16-17; Doc. 70 at 223-27).

warehouse with his canine partner, hoping to catch any burglars by surprise. (Doc. 72 at 81-82; Doc. 73 at 39-40). As the encounter began, he was the only law enforcement officer present. (Doc. 73 at 146-47; Doc. 63 at 17-19).

Without identifying himself or his office, Deputy Geiger demanded Crawford and Reed "put [their] guns on the fucking ground." (Doc. 70 at 46, 52-54, 61-62). He threatened to shoot them "in the fucking head" if they did not comply. (*Id.* at 46). He continued to fail to identify himself or state he was a police officer.  (*Id.* at 63). Unaware who the trespasser was and being threatened with being shot, Crawford and Reed stood fast, guns trained on the perceived threat. (*Id.*).

The stand-off lasted roughly thirty to forty seconds. (Doc. 70 at 63; Doc 71 at 120-21).

At some point, Crawford heard the sound of radio traffic. (*Id.*). Having served in the military and as a corrections officer, he realized the person confronting him might be a police officer. (*Id.*). He put his shotgun on the ground and told Reed to do the same with his rifle. (*Id.* at 62; Doc. 71 at 128-30). Reed complied. (Doc. 71 at 128-30). Crawford and Reed then stepped back from their guns and put their hands in the air. (Doc. 81-1 ¶ 2; Doc. 70 at 62-63, 69).

Crawford still wore a holstered pistol on his side. (Doc. 70 at 68). He did not remove it because "[n]o one ever touches a gun when an officer, when you have officers showed up. No one ever touches a gun, you never go near a weapon or touch anything." (*Id.* at 68). Further, Deputy Geiger never ordered him to remove his pistol. (*Id.* at 70-71).

At about this time, Ornelas, having heard a commotion, came from the house to find out what was happening. (Doc. 72 at 111-12). She immediately told Deputy Geiger that Crawford and Reed were the owner's son and grandson. (*Id.*). Deputy Geiger ignored Ornelas. (*Id.*). He made no effort to verify her statements. (*Id.*).

3

Many other officers soon arrived,[2] including defendants Allen County Sheriff's Deputies Roy Brock and Cory Lee; Elida, Ohio, Village Police Department Officer Jesse Evilsizer; Ohio State Highway Patrol Troopers Robert Gatchel and Daniel Edelbrock; and Lima, Ohio, City Police Sergeant Nicholas Hart (collectively, along with Deputy Geiger, the "on-scene officers").[3] (Doc. 70 at 71).

Deputy Geiger continued pointing his light in Crawford's eyes, yelling expletives and threatening to shoot him. (*Id.* at 71). Deputy Geiger ordered Crawford to get on the ground. (*Id.* at 76, 80). Instead, Crawford kept his hands in the air and, to confirm his impression that Deputy Geiger might be a law enforcement officer, continued asking him to identify himself. (*Id.* at 69).

Deputy Geiger then ordered Crawford to put his hands on the truck. (*Id.* at 75). Crawford complied. (*Id.*). Deputy Geiger, twenty years younger and 100 pounds heavier than Crawford, immediately slammed Crawford's head onto the truck's hood, placing all his weight on Crawford's neck and pinning him down. (*Id.* at 79, 89-90). Officer Evilsizer then helped Deputy Geiger handcuff Crawford. (*Id.* at 93, 208-12).

As they were doing so, Crawford told Reed and Ornelas to take out their cell phones and record the officers' actions. (*Id.* at 89-90; Doc. 71 at 133, 139).

Ornelas had no cell phone with her. (Doc. 72 at 183). Nonetheless, Sergeant Hart ran up to her and struck her chest with the heel of his palm, knocking her off balance and against the truck bed. (*Id.* at 118, 145-47). Shortly thereafter, Deputy Lee grabbed her, twisted her arm behind her back, handcuffed her and put her on the ground. (*Id.* at 120; Doc. 71 at 187).

---

[2] When Deputy Geiger first encountered Crawford and Reed, he radioed for assistance using a code indicating he was in trouble. (Doc. 73 at 56).

[3] For the purposes of my analysis, I divide the on-scene officers into two groups: 1) the "supporting officers" (Troopers Gatchel and Edelbrock, and Deputy Brock); and 2) the "arresting officers" (Deputies Geiger and Lee, Sergeant Hart and Officer Evilsizer).

Sergeant Hart then turned his attention to Reed, who was reaching for a cell phone at his hip. (Doc. 64 at 139-40). Sergeant Hart took him to the ground, forcing his knees into Reed's back. (Doc. 71 at 182-88). Sergeant Hart, with Deputy Lee's assistance, handcuffed Reed. (Doc. 74 at 29). Troopers Gatchel and Edelbrock then lifted Reed off the ground and took him to a patrol car. (*Id.* at 142).

Deputies also placed Ornelas and Crawford into patrol cars. Officers drove the three plaintiffs to the Allen County Jail. (Doc. 70 at 121; Doc. 71 at 158; Doc. 72 at 121). They remained confined for several hours before their release. (*Id.*).

On August 26, 2013, plaintiffs sued the on-scene officers. (Doc. 1). Plaintiffs also sued the heads of the various agencies employing the on-scene officers (collectively, the "supervisory officers"), and Allen County, the City of Lima, and the Village of Elida (collectively, the "governmental entities"). (*Id.*).

Plaintiffs asserted several claims for relief: 1) Fourth/Fourteenth Amendment unreasonable use of force; 2) Fourth/Fourteenth Amendment failure to intervene; 3) Fourth/Fourteenth Amendment unlawful arrest and detention; 4) First/Fourteenth Amendment right to film and record; 5) Fourth/Fourteenth Amendment conspiracy; 6) assault and battery under Ohio law; 7) false arrest and detention under Ohio law; and 8) supervisory and derivative government entity liability. (*Id.*).

Various defendants filed motions to dismiss some of or all the claims against them. (Docs. 30, 33, 34). For the reasons set forth in *Crawford v. Deputy Geiger*, 996 F. Supp. 2d 603 (N.D. Ohio 2014), I granted the motions in part and denied them in part, dismissing the supervisory officials and governmental entities from the case entirely, and dismissing some claims as to certain other defendants.

The remaining defendants – Deputies Geiger, Lee and Brock, Officer Evilsizer, Sergeant Hart, and Troopers Gatchel and Edelbrock – now seek summary judgment on the surviving claims. (Docs. 66, 67, 69, 77).

### Standard of Review

Summary judgment is appropriate under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which the party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323.

Once the movant meets that initial burden, the "burden shifts to the nonmoving party [to] set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, 477 U.S. at 324.

I accept the non-movant's evidence as true and construe all evidence in its favor. *Eastman Kodak Co.*, 504 U.S. at 456.

### Discussion

As noted above, there are several pending motions: 1) plaintiffs' motion for leave to file an amended the complaint (Doc. 80); and 2) defendants' motions for summary judgment. (Docs. 66, 67, 69, 77). I address each in turn.

### A. Motion for Leave to Amend the Complaint

Plaintiffs seek leave to amend the complaint to include four claims I previously dismissed: 1) Fourth/Fourteenth Amendment failure to intervene; 2) Fourth/Fourteenth

Amendment conspiracy; and 3) state-law tort claims of assault and battery, and 4) false arrest and detention. (Doc. 80).

They contend they have discovered sufficient evidence to meet the *Twombly* requirement a plaintiff plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.").

Under Fed. R. Civ. P. 15(a)(2), I should give plaintiffs leave to amend their pleading if "justice so requires." When a party decides "to advance a new claim as a result of [ ] discovery," Rule 15(a) provides for "liberal amendment to the complaint." *Tucker v. Union of Needletrades, Indus. & Textile Emp.*, 407 F.3d 784, 788 (6th Cir. 2005).

"Nevertheless, leave to amend 'should be denied if the amendment is brought in bad faith, for dilatory purposes, results in undue delay or prejudice to the opposing party, or would be futile.'" *Carson v. U.S. Office of Special Counsel*, 633 F.3d 487, 495 (6th Cir. 2011) (quoting *Crawford v. Roane*, 53 F.3d 750, 753 (6th Cir. 1995)). A court may deny a motion for leave to amend for futility if the amendment could not withstand a motion to dismiss. *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010); *Midkiff v. Adams Cnty. Reg'l Water Dist.*, 409 F.3d 758, 767 (6th Cir. 2005).

Here, I find plaintiffs' proposed claims futile and unnecessary to serve justice.

Plaintiffs' proposed failure to intervene claim would not survive a motion to dismiss. *See id.* In the Sixth Circuit, the elements of a § 1983 failure to intervene claim are:

> [A] police officer who fails to act to prevent the use of excessive
> force may be held liable when (1) the officer observed or had
> reason to know that excessive force would be or was being used,

7

and (2) the officer had both the opportunity and the means to prevent the harm from occurring.

*Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997).

As Crawford himself admits, (Doc. 70 at 69, 73, 119, 239), the officers who arrived on scene after Deputy Geiger "[had] no idea what transpired" and believed they were approaching a scene with armed suspects threatening a fellow officer. *See United States v. Hensley*, 469 U.S. 221, 231 (1985) ("[P]olice officers can act on directions and information transmitted by one officer to another and . . . officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information.").

The scene was dark (at least in part), chaotic and confusing. (Doc. 61 at 35-36, 40-42, 45-56, 59, 70-79, 103, 106-07, 111). The entire incident unfolded in less than a minute. (Doc. 70 at 63; Doc 71 at 120-21). Circumstances such as these offer too little time for the obligation to intervene to arise. *See Ontha v. Rutherford County, Tennessee*, 2007 WL 776898, *7 (6th Cir.) (officer not liable for failure to intervene where incident occurred over a short period of time).

Moreover, the on-scene officers could not reasonably have "had reason to know that excessive force would be or was being used." *Turner*, 119 F.3d at 429. Plaintiffs' proposed failure to intervene claim is therefore futile. *See Carson*, 633 F.3d at 495.

Plaintiffs' proposed conspiracy claim is likewise futile. In the Sixth Circuit:

> A civil conspiracy under § 1983 is "an agreement between two or more persons to injure another by unlawful action." To prevail on a civil conspiracy claim, [plaintiff] must show that (1) a "single plan" existed, (2) [defendant] "shared in the general conspiratorial objective" to deprive [plaintiff] of his constitutional (or federal statutory) rights, and (3) "an overt act was committed in furtherance of the conspiracy that caused injury" to [plaintiff]. "Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy [and] [e]ach conspirator need not have known all of the details of the illegal plan or all of the participants involved."

8

*Bazzi v. City of Dearborn,* 658 F.3d 598, 602 (6th Cir. 2011) (citations omitted).

It is "well-settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim." *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987).

Here, plaintiffs base their proposed claim on mere conclusory assertions. *See Twombly*, 550 U.S. at 555 ("[C]onclusory allegations of a conspiracy are insufficient"). There is simply no evidence of a "single plan" to deprive plaintiffs of their constitutional rights. *See Bazzi*, 658 F.3d at 602. To the contrary, the evidence clearly suggests the incident occurred unexpectedly and under ambiguous circumstances. Accordingly, plaintiffs have not alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Iqbal*, 556 U.S. at 677-78.

Finally, plaintiffs' proposed state-law claims are, like the other claims, futile. Plaintiffs allege the on-scene officers violated Ohio law by maliciously and unlawfully assaulting, battering, arresting and detaining them. However, plaintiffs' allegation of malice is conclusory. Merely alleging a defendant acted maliciously is not sufficient to state a claim. *See, e.g., Lisboa v. Lisboa*, 2011 WL 319956, *5 (Ohio Ct. App.) ("Appellant's complaint merely contains general conclusory statements that [an individual] acted maliciously and in bad faith. Such unsupported conclusions are not sufficient to withstand a motion to dismiss.").

Furthermore, as discussed below, this case will go to trial against certain defendants to determine whether they violated plaintiffs' constitutional rights against arrest without probable cause, detention without adequate suspicion, and excessive force when taking a person into custody. I find the proposed state-law claims to be duplicative of those claims, rather than new causes of action. They rely on the same facts and will provide for the same types of damages if

9

plaintiffs prove their case. No useful purpose being served by an amendment, justice does not require me to allow leave to amend to include the state-law claims. *See* Fed. R. Civ. P. 15(a)(2).

Accordingly, I deny plaintiffs' motion for leave to amend the complaint.

### B. Motions for Summary Judgment

Plaintiffs' remaining claims allege violations of: 1) the First/Fourteenth Amendment right to film and record; and 2) the Fourth/Fourteenth Amendment rights against detention without adequate cause, arrest without probable cause, and use of excessive force when taking an individual into custody.

Defendants contend they are entitled to qualified immunity, and thus are not answerable in damages to plaintiffs.

Qualified immunity is not a defense to liability. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Instead, the doctrine, when applicable, precludes suit entirely. *Id.* The doctrine has this effect so government officials need not undergo the burdens of discovery and trial. *Id.*

The Sixth Circuit has summarized the doctrine of qualified immunity and related principles:

> Qualified immunity shields government officials from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Qualified immunity ordinarily applies unless it is obvious that no reasonably competent official would have concluded that the actions taken were unlawful. Qualified immunity gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law. Qualified immunity applies irrespective of whether the official's error was a mistake of law or a mistake of fact, or a mistake based on mixed questions of law and fact.
>
> Plaintiff bears the burden of showing that defendants are not entitled to qualified immunity. Plaintiff must show both that, viewing the evidence in the light most favorable to her, a constitutional right was violated and that the right was clearly

> established at the time of the violation. If plaintiff fails to show either that a constitutional right was violated or that the right was clearly established, she will have failed to carry her burden. Moreover, to satisfy the second prong of the standard, plaintiff must show that the right was clearly established in a "particularized sense," such that a reasonable officer confronted with the same situation would have known that using deadly force would violate that right.

*Chappell v. City Of Cleveland,* 585 F.3d 901, 907 (6th Cir. 2009) (citations and internal quotation marks omitted).

In short, to decide whether an officer is entitled to qualified immunity a court must determine whether: 1) plaintiff has shown the officer violated a constitutional right, and 2) if so, the constitutional right was "clearly established" when he or she did so. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

> For a constitutional right to be "clearly established," the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton,* 483 U.S. 635, 640 (1987).

To determine whether a constitutional right is clearly established, a court, "must look first to decisions of the Supreme Court, then to decisions of [the Sixth Circuit] and other courts within [the Sixth Circuit], and finally to decisions of other circuits." *Baker v. City of Hamilton*, 471 F.3d 601, 606 (6th Cir. 2006) (citations omitted).[4] Thus, even if neither the Supreme Court nor the Sixth Circuit has held a right is clearly established, they need not have done so. Narrowly

---

[4] *But see Walton v. City of Southfield*, 995 F.2d 1331, 1336 (6th Cir. 1993) ("[I]t is only in extraordinary cases that we can look beyond Supreme Court and Sixth Circuit precedent to find clearly established law.").

circumscribed, unequivocal, unanimous, and on-point case law from other circuit may suffice. *Blake v. Wright*, 179 F.3d 1003, 1007 (6th Cir. 1999).

To be sure, those decisions must both point unmistakably to the unconstitutionality of the conduct complained of and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting. *Durham v. Nu'Man*, 97 F.3d 862, 866 (6th Cir. 1996) (citation and internal quotation marks omitted).

Especially where there is no declarative Supreme Court precedent, lower courts must have defined the contours of the constitutional right at issue with sufficient certainty and clarity that it "would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

Summary judgment based on qualified immunity is not appropriate if there are factual disputes or genuine issues of material fact "involving an issue on which the question of immunity turns, such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights." *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992).

As set forth below, I find all defendants are entitled to qualified immunity as to the First/Fourteenth Amendment claim. I further find the supporting officers are entitled to qualified immunity as to plaintiffs' Fourth/Fourteenth Amendment claims. Of the arresting officers, only Officer Evilsizer is entitled to qualified immunity as to the Fourth/Fourteenth Amendment unlawful arrest and detention claim. Finally, none of the arresting officers are entitled to qualified immunity as to the Fourth/Fourteenth Amendment excessive force claim.

### 1. First/Fourteenth Amendment Claim

Freedom of the press, as protected under the First Amendment, "goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 783 (1978). The Amendment extends to "news gathering." *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972). This, in turn, ensures and enhances, to the maximum extent possible, "free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966).

The First Amendment protects not just the right of the press to gather news – it affords that right to the general public as well. *Branzburg*, *supra*, 408 U.S. at 684 ("It has generally been held that the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally.").

The Supreme Court and Sixth Circuit have not ruled specifically on the right of the public openly to film police officers and their actions in a public setting. Other circuit courts have, however, and have ruled such a right exists. *See ACLU v. Alvarez*, 679 F.3d 583, 599-560 (7th Cir.) (Illinois eavesdropping statute did not preclude civilian from openly recording police with a cell phone); *Glik v. Cunniffe*, 655 F.3d 78, 79 (1st Cir. 2011) ( "unambiguous[]" constitutionally protected right to videotape police carrying out their duties in public); *Smith v. Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (finding "First Amendment right, subject to reasonable time, manner and place restrictions, to photograph or videotape police conduct"); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) (recognizing  plaintiff's videotaping of police officers as a "First Amendment right to film matters of public interest").

I agree with those decisions and their holdings that there is a First Amendment right openly to film police officers carrying out their duties in public.

Earlier in this case, I ruled that right was clearly established. *See Crawford*, 996 F. Supp. 2d at 603. On further consideration in connection with the instant motions, however, I believe the right openly to film police carrying out their duties is not so clear cut that it is proper in *this* case to withhold qualified immunity as to the First Amendment claim. As the Fourth Circuit has emphaisized, "the contours of the constitutional right must be sufficiently clear that a reasonable official would understand what he is doing violates that right." *Szymecki v. Houck*, 353 Fed. Appx. 852, 852-53 (4th Cir. 2009) (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)) (internal quotation marks omitted) (unpublished disposition). That is not the case here – the exact nature of the right, and the circumstances in which it applies, have been, and continue to be, subject to debate.

The Third and Fourth Circuits have reached the same conclusion. *See Kelly v. City of Carlisle*, 622 F.3d 248, 262-62 (3d Cir. 2010) (case law insufficient "to put a reasonably competent officer on 'fair notice' that seizing a camera or arresting an individual for videotaping police . . . would violate the First Amendment."); *Szymecki*, 353 Fed. Appx. at 852-53.

In light of the as yet unsettled constitutional status of the ability, without fear of arrest, to record what one can otherwise lawfully see and hear, I uphold the claim of qualified immunity *vis-a-vis* the First Amendment claim in this case. Doing so, I vacate that portion of my opinion in *Crawford, supra*.[5]

---

[5]  I am firmly persuaded the First Amendment shields citizens against detention or arrest merely for making a photographic, video or sound  recording, or immutable record of what those citizens lawfully see or hear of police activity within public view. To allow the fog of denial and acquiescence to envelop and conceal police misconduct is, under a regimen where citizen recording of such misconduct could lead to arrest, to endorse the "Nacht und Nebel" mindset and methodology of the police state. No law enforcement officer who is enforcing the law lawfully can or should fear citizen recording, as the recording will vindicate the lawfulness of his or her actions, and protect, rather than endanger, him or her in the face of bogus misconduct allegations.

## 2. Fourth/Fourteenth Amendment Claims

Plaintiffs argue defendants violate the Fourth and Fourteenth Amendments by unlawfully arresting and detaining them, and also by using excessive force to do so.

The Fourth Amendment ensures the "right of the people to be secure in their persons . . . against unreasonable . . . seizures." A "seizure," in Fourth Amendment terms, occurs "when there is a governmental termination of freedom of movement through means intentionally applied." *Brower v. County of Inyo*, 489 U.S. 593, 596–597 (1989). A "person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall,* 446 U.S. 544, 553 (1980).[6]

There is no dispute that arresting officers "seized" the plaintiffs in Fourth Amendment terms. Detention is a Fourth Amendment seizure. *See I.N.S. v. Delgado,* 466 U.S. 210, 215 (1984) ("[I]f, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave"); *Colorado v. Bannister*, 449 U.S. 1, 4 (1980) (stop of vehicle and ensuing detention of occupants is a seizure). So too is an arrest. *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011). Use of force to restrain freedom of movement constitutes a seizure. *Terry v. Ohio*, 392 U.S. 1, 20 n.10 (1968) ("[W]hen the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may . . . a 'seizure' has occurred.").

---

[6] Plaintiffs do not allege Deputy Brock used force on or otherwise seized them in any way. Indeed, it is undisputed he arrived on scene after plaintiffs were in custody. (Doc. 75 at 21-22). A reasonable jury therefore could not conclude Brock violated plaintiffs' Fourth/Fourteenth Amendment rights. *See id.* Likewise, Reed's testimony shows Troopers Gatchel and Edelborck, though nearby and at hand, had nothing to do with his being seized/detained. Their involvement in placing Reed in a patrol car did not give rise to a separate, independent seizure for which they are constitutionally accountable. These supporting officers are entitled to summary judgment on plaintiffs' Fourth/Fourteenth Amendment claims.

15

In light of this standard, if the jurors resolve pertinent factual disputes in plaintiffs' favor, they will necessarily find: 1) Sergeant Hart seized Ornelas and Reed when he struck Ornelas with the heel of his palm and then took Reed to the ground; 2) Deputy Lee seized Ornelas by twisting her arm and handcuffing her and Reed by handcuffing him; and 3) Deputy Geiger and Officer Evilsizer seized Crawford when they pinned him against the truck and handcuffed him.

The next question is whether the seizure of any plaintiff was lawful.

"A person who has been the victim of an unlawful arrest or wrongful seizure under the color of law has a claim based on the Fourth Amendment guarantee that government officials may not subject citizens to searches or seizures without proper authorization." *Brooks v. Rothe*, 577 F.3d 701, 706 (6th Cir. 2009) (citing U.S. Const. amend. IV).

However, "a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Id.* (citing *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)). "The validity of the arrest does not depend on whether the suspect actually committed a crime." *Id.* (citing *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979)).

Thus, "in order for a wrongful arrest claim to succeed . . . a plaintiff must prove that the police lacked probable cause." *Id.* (quoting *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir.2002)). Probable cause exists "if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." *Id.* (citing *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir.2007)).

Accepting plaintiffs' version of events as true, a reasonable jury could conclude the arresting officers lacked probable cause to arrest plaintiffs.

16

First, a reasonable jury could find Crawford was identifying himself to Deputy Geiger, stating he was the property owner and lawfully armed, demanding whoever was threatening him to identify himself, and Geiger was not responding. As soon as he suspected Geiger might be a police officer, he and Reed disarmed and raised their hands in the air.

At that point, neither Crawford nor Reed was brandishing any weapon, and neither, by any objective standard, was engaged in any threatening noncompliance. This was particularly so, a reasonable jury could find, given that other officers had arrived on the scene, some with guns drawn. Those facts would undermine Geiger's assertion there was probable cause to arrest Crawford (and Reed for that matter).

Second, a reasonable jury could find Ornelas, who was unarmed, was not interfering with the arresting officers. Her statements to the arresting officers, viewed objectively, sought to explain and clarify the situation, and thus assist, not interfere with, the officers whom she had summoned with her 911 call. Those statements certainly could not reasonably have led Deputy Lee to believe he had probable cause to arrest her.[7]

Third, a reasonable jury could find Deputy Lee and Sergeant Hart arrested Reed for reaching for his cell phone, although the phone was in plain sight and did not pose a threat giving rise to probable cause.[8] This is particularly so because Crawford gave Reed instructions to film his arrest, instructions a reasonable jury could find Deputy Lee and Sergeant Hart heard.

---

[7] The reason for Ornelas's arrest is in dispute. Deputy Lee argues he arrested her because she tried to push through him to where Sergeant Hart had Reed in custody, and thus was obstructing official business. (Doc. 77 at 17). As discussed below, a jury will need to decide whether that reason is true, as that will determine whether Deputy Lee is entitled to qualified immunity for Ornelas's arrest, *see infra*.

[8] The reason for Reed's arrest also is in dispute. Sergeant Hart asserts he initiated Reed's arrest because Reed was resisting orders from Deputy Lee, who Deputy Geiger had instructed to arrest Reed because of their earlier stand-off. (Doc. 95 at 3; Doc. 73 at 100-02). Deputy Lee testified Deputy Geiger had asked him to "handle the situation with Reed," and he intended to arrest Reed

In sum, a reasonable jury could, if concluding plaintiffs' allegations to be true, find:

> Plaintiffs were at all times lawfully on the premises, and the arresting officers were on actual notice of that fact in light of Crawford's repeated statements of identity and ownership;
>
> Crawford and Reed were at all times in lawful possession of their firearms; if they pointed them at Deputy Geiger, they did so with an objectively reasonable, good-faith belief they were confronting an unknown trespasser and possible burglar;
>
> Once Crawford apprehended, despite Deputy Geiger's unreasonable failure to identify himself, their assailant might be a police officer, he and Reed disarmed themselves and submitted to Geiger's authority;
>
> Once Crawford and Reed disarmed themselves and placed their hands in the air, no reasonable basis existed for any arresting officer to apprehend that either was armed and dangerous;
>
> Failure to get on the ground, as Deputy Geiger was demanding, did not constitute such noncompliance as to justify the ensuing forceful seizure, arrest and detention;
>
> No plaintiff committed any crime, and there was no objectively reasonable basis for believing they had, in light of what officers objectively knew before the forceful seizure, detention and arrest;
>
> There being no reasonable basis for concluding any plaintiff was armed and dangerous, there was no lawful grounds for any on-scene officer to seize plaintiffs; those who did so acted without reasonable suspicion or probable or other lawful cause;
>
> When Deputy Geiger and Officer Evilsizer pinned Crawford against the truck and handcuffed him, they had no lawful authority for doing so because they could not reasonably have believed Crawford was armed and dangerous or had committed or was committing a crime; under those circumstances no reasonable officer could have concluded objectively he was lawfully authorized to impose any restraint on Crawford; and

---

"[b]ecause he's yelling . . . [also] I did see weapons on the ground, and I had an officer call for assistance. I don't know what's going on. I'm going to detain him you know for my safety," and to "diffuse the situation." (Doc. 74 at 24-25). As discussed below, a jury will need to decide the reason for Reed's arrest, because depending on which reason is true, Sergeant Hart and Deputy Lee may be entitled to qualified immunity for Reed's arrest, *see infra*.

> For the same reasons, Sergeant Hart unjustifiably and unlawfully
> seized and used unreasonable force against Ornelas; Deputy Lee
> unjustifiably and unlawfully seized and used unreasonable force
> against Ornelas; and Sergeant Hart and Deputy Lee unjustifiably
> and unlawfully seized and used unreasonable force against Reed.[9]

If a reasonable jury found plaintiffs proved these facts (and, to the extent the instructions and evidence called on the jury to do so), plaintiffs would have established violations of the Fourth/Fourteenth Amendment by the arresting officers.

The final step of the analysis is whether plaintiffs also would have met their burden of proving qualified immunity did not protect the arresting officers from liability.

The law is clear: qualified immunity does not protect an officer who seizes an individual without probable cause. *Leonard v. Robinson*, 477 F.3d 347, 354 (6th Cir. 2007) ("We will not grant immunity to a defendant if no reasonably competent peace officer would have found probable cause.").

Where the reasonableness of an officer's actions hinge on disputed issues of fact, "the jury becomes the final arbiter of . . . immunity, since the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury." *Brandenburg v. Cureton*, 882 F.2d 211, 215-16 (6th Cir. 1989).

---

[9] The Supreme Court outlined the factors for determining whether the force an officer used to subdue a subject was excessive in *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citation omitted):

> Because "[t]he test of reasonableness under the Fourth Amendment is not capable
> of precise definition or mechanical application," however, its proper application
> requires careful attention to the facts and circumstances of each particular case,
> including the severity of the crime at issue, whether the suspect poses an
> immediate threat to the safety of the officers or others, and whether he is actively
> resisting arrest or attempting to evade arrest by flight.

A reasonable jury could find plaintiffs had committed no crime, posed no immediate threat to the safety of officers or others, and were not resisting in any way.

Plaintiffs' evidence, if a jury deemed it credible, would cast doubt on the reasonableness of Deputy Geiger's failure to identify himself or his office, and, indeed, the arresting officers' conduct from that point forward. *See Yates v. City of Cleveland*, 941 F.2d 444, 447 (6th Cir. 1991) (officer who enters dark hallway in private residence without identifying himself not entitled to qualified immunity). A jury might reasonably conclude if Deputy Geiger promptly had identified himself when he first encountered Crawford and Reed, the night would have gone very differently, and this lawsuit never would have materialized.

Defendants cite *Chappell v. City of Cleveland*, 585 F.3d 901, 914 (6th Cir. 2009), to argue "it is immaterial whether officers identify themselves as law enforcement or suspects fail to recognize them as such." (Doc. 94 at 2). There, two police detectives, who had not identified themselves as such, shot a teenage suspect who was approaching them with a knife in tight quarters. *Id.* The detectives ordered him to stop; he did not. *Id.* "Believing they were threatened with imminent serious bodily harm, both detectives simultaneously opened fire, each striking [the decedent] with several shots, killing him instantly. The entire encounter transpired in seconds." *Id.*

The estate of the decedent sued, arguing the incident would have gone differently had the officers identified themselves. *Id.* at 905. The district court denied the detectives qualified immunity. *Id.* On appeal, the Sixth Circuit reversed, holding "whether the detectives identified themselves [or not] represents no grounds for denying defendants qualified immunity." *Id.* at 916.

*Chappell* is entirely inapposite here. The detectives there were under what they believed to be imminent threat of serious bodily harm. They had to make a split-second decision to protect themselves using deadly force. Here, on the other hand, any threat Deputy Geiger might have felt

from Crawford and Reed would have ended when they realized he was a police officer, disarmed, raised their hands in the air, and explained their lawful presence on the property. At that point, cooler heads should have prevailed among the arresting officers.

To be sure, taking as true plaintiffs' version of the facts, probable cause did not support Crawford's arrest. *Leonard*, 477 F.3d at 354. That being the case, qualified immunity does not protect Deputy Geiger from plaintiffs' unlawful arrest and detention claim.

Officer Evilsizer, however, properly relied on Deputy Geiger's assertion there was probable cause to arrest Crawford. *See Hensley*, 469 U.S. at 231 (officer can rely on information from another officer). Qualified immunity therefore protects Officer Evilsizer for Crawford's arrest.

As for Sergeant Hart and Deputy Lee, as noted above, the reasons for Ornelas's and Reed's arrests are in dispute. Depending on which reasons the jury decides are true, Sergeant Hart and Deputy Lee may, or may not, be entitled to qualified immunity for the arrests. *See id.*; *Bletz v. Gribble*, 641 F.3d 743, 755 (6th Cir. 2011) (officer may detain innocent bystanders "to secure the scene of a valid search or arrest and ensure the safety of officers and others").

With respect to Reed, as discussed above, Sergeant Hart and Deputy Lee are entitled to qualified immunity from the First/Fourteenth Amendment right to film and record claim. They are not, however, necessarily also entitled to immunity for arresting Reed as he attempted to film Crawford's arrest (if, as plaintiffs argue, that was in fact the reason for Reed's arrest).

Whereas the First Amendment right to film police in public is not clearly established, the Fourth Amendment right against arrest and detention absent probable cause clearly is. Plaintiffs simply need to prove the police had no probable cause.

Accepting plaintiffs' version of the facts as true, a reasonable jury could find plaintiffs meet that burden. I am aware of no Ohio statute, and defendants point to none, making it a crime openly to film police as they carry out their duties in public. Thus, a jury could conclude Sergeant Hart and Deputy Lee arrested Reed without probable cause. In that case, there would be no qualified immunity for either officer.

In other words, Sergeant Hart's and Deputy Lee's entitlement to qualified immunity on the unlawful arrest claim hinges on a question of fact, and is therefore unsuited to adjudication on a motion for summary judgment. *Brandenburg*, 882 F.2d at 215-16. The distinction between the First and Fourth Amendment analyses on this issue is a fine one, but the constitution requires it.

In any event, no arresting officer is entitled to qualified immunity as to the excessive force claim. The right against excessive force is very well established. As stated in *Norton v. Stille,* 526 F. App'x 509, 513-514 (6th Cir. 2013) (unpublished disposition) (citation omitted):

> It is clearly established that officers may not use force on a detainee who is subdued and controlled. "[P]eople who pose no safety risk to the police [have a right] to be free from gratuitous violence during arrest." When force is used on a detainee who poses no threat to officers or anyone else, that force is excessive and it is a violation of the detainee's Fourth Amendment rights.

*See also Correa v. Simone,* 528 F. App'x 531, 535 (6th Cir. 2013) (no immunity where officer tazed non-resistant § 1983 plaintiff); *McCaig v. Raber*, 515 F. App'x 551, 555 (6th Cir. 2013) (including cases cited therein).

Under the Sixth Circuit's "segmented approach" to excessive force claims, I "carve up" the events surrounding the challenged police action and evaluate the reasonableness of force by looking only at the moments immediately preceding the officer's use of force. *See Dickerson v. McClellan*, 101 F.3d 1151, 1161-62 (6th Cir.1996).

A reasonable jury could find plaintiffs were non-resistant and not posing a threat to anyone moments before the arresting officers used force on them. In that case, qualified immunity would not protect the officers from liability. *Id.*

Accordingly: 1) I deny the motions for summary judgment of Deputies Geiger and Lee, and Sergeant Hart as to the unlawful arrest claim; 2) I grant Officer Evilsizer's motion for summary judgment as to the unlawful arrest claim; and 3) I deny all the arresting officers' motions for summary judgment as to the excessive force claim.

The arresting officers will therefore stand trial to determine whether they violated plaintiffs' constitutional rights against arrest and detention without lawful cause and/or excessive use of force.

## Conclusion

For the foregoing reasons, it is hereby

ORDERED THAT

1. Plaintiffs' motion for leave to file an amended complaint (Doc. 80) be, and the same hereby is, denied;

2. The motions for summary judgment of Troopers Gatchel and Edelbrock, and Deputy Brock (Docs. 69, 77), be, and the same hereby are, granted in their entirety;

3. The motions for summary judgment of Deputies Geiger and Lee, Sergeant Hart and Officer Evilsizer (Docs. 66, 67, 77) on plaintiffs' First/Fourteenth Amendment claim (Count IV) be, and the same hereby are, granted;

4.    The motion for summary judgment of Officer Evilsizer on plaintiffs' Fourth/Fourteenth excessive use of force claim (Count I) be, and the same hereby is, denied;

5.    The motion for summary judgment of Officer Evilsizer on plaintiffs' Fourth/Fourteenth unlawful arrest and detention claim (Count III) be, and the same hereby is, granted; and

6.    The motions for summary judgment of Deputies Geiger and Lee, and Sergeant Hart (Docs. 67, 77) on plaintiffs' Fourth/Fourteenth unlawful arrest and detention and excessive use of force claims (Counts I and III) be, and the same hereby are, denied.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge

24